JASON H. LEE (Cal. Bar No. 253140)
JASON M. BUSSEY (Cal. Bar No. 227185)
CHRISTINA N. FILIPP (Cal. Bar No. 287919)
filippc@sec.gov
CHRISTINE HOM (GA Bar No. 598276)
homc@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 700
San Francisco, CA 94104
(415) 705-2500 (Telephone)
(415) 705-2501 (Facsimile)

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>MARK D. HANF and<br>HOAI-NAM CHU PHAN a/k/a NAM PHAN,<br><br>Defendants. | Case No.<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Securities and Exchange Commission (the "SEC") alleges:

**SUMMARY OF THE ACTION**

1. From at least December 2021 through approximately November 2025 (the "Relevant Period"), Defendants Mark D. Hanf ("Hanf") and Hoai-Nam Chu Phan a/k/a Nam Phan ("Phan") (collectively, "Defendants") orchestrated an offering fraud and Ponzi-like scheme, raising over $80 million from approximately 190 primarily retail investors, many of whom were senior citizens and retired. Defendants' scheme spanned multiple states, but primarily involved investors located in California.

2. Hanf, the founder and former Chief Executive Officer of Pacific Private Money Group LLC ("PPMG"), and Phan, the former Chief Operating Officer of PPMG subsidiary Pacific Private Money, Inc., purported to offer investors consistent returns through PPMG's real estate

loan investment funds, including Pacific Private Money Fund I LLC ("Pacific Fund") and Pacific Freedom Fund LLC ("Freedom Fund"). During the Relevant Period, Defendants offered investors securities in the Pacific Fund and the Freedom Fund in the form of membership interests in the limited liability companies.

3. In promoting the Pacific Fund and the Freedom Fund, Defendants made and disseminated numerous material misrepresentations to investors, including in the funds' offering documents, in emails directly to investors, orally during in-person meetings, and in online webinars. Defendants misrepresented to investors that Pacific Fund and Freedom Fund capital would be used to originate or purchase loans secured by real estate, and that investors could expect to receive preferred or fixed rates of return from the funds' real estate lending activities.

4. In reality, Defendants regularly used Pacific Fund and Freedom Fund investor capital to pay distributions and redemptions to earlier investors. The returns that Defendants promised were sourced largely from new investor money rather than from the Pacific Fund's and Freedom Fund's earnings connected to their respective real estate lending business. In fact, the funds were both unprofitable for a majority of the Relevant Period.

5. Additionally, Defendants did not disclose to Pacific Fund and Freedom Fund investors that investor funds were diverted for Hanf's personal use. Hanf misappropriated at least $7 million of PPMG investor money for his own personal use.

6. To perpetuate the fraudulent scheme, in addition to disseminating materially misleading statements, Defendants also used new investor money to make Ponzi-like payments to existing investors to give the false impression that Defendants were successfully generating returns for Pacific Fund and Freedom Fund investors, and that those funds were legitimate and profitable.

7. In and around the fall of 2025, Hanf's and Phan's Ponzi-like scheme unraveled as numerous investors demanded to withdraw their money and Defendants did not have sufficient funds to satisfy those requests. After October 2025, Defendants stopped paying investor distributions, and investors were unable to withdraw their investments, resulting in substantial losses.

8. The Pacific Fund and the Freedom Fund each filed for Chapter 11 bankruptcy

protection in June 2026, as did PPMG and other affiliated entities. Despite total outstanding investments in the Freedom Fund and the Pacific Fund of almost $121 million, by February 2026 the total recoverable assets of those funds were estimated to be less than $17 million.

9. As a result of the conduct alleged in this Complaint, Hanf and Phan violated the antifraud provisions of the federal securities laws. Hanf and Phan each violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; Hanf violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)]; and Phan violated Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)].

10. In the interest of protecting the public from further violations and enforcing the federal securities laws, the SEC seeks against Hanf and Phan permanent injunctive relief and civil monetary penalties, as well as an order prohibiting Hanf and Phan from participating in the issuance, purchase, offer, or sale of any security. The SEC further seeks against Hanf disgorgement of ill-gotten gains with prejudgment interest.

## JURISDICTION AND VENUE

11. The SEC brings this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

12. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

13. Hanf and Phan, directly or indirectly, made use of the means and instrumentalities of interstate commerce or of the mails in connection with the acts, transactions, practices, and courses of business alleged in this Complaint.

14. Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)], because acts, transactions, practices, and courses of business that form the basis for the violations alleged in this Complaint occurred in this District. In addition, venue is proper because Hanf and Phan resided

and transacted business in Marin County at the time of the conduct alleged in this Complaint.

## DIVISIONAL ASSIGNMENT

15. Under Civil Local Rules 3-2(d) and 3-5, assignment of this civil action to the San Francisco Division or the Oakland Division is appropriate because a substantial part of the events and omissions which give rise to the claims alleged herein occurred in Marin County.

## DEFENDANTS

16. Defendant **Mark Hanf**, age 65, is a resident of Belvedere-Tiburon, California. Hanf was the founder, President, and Chief Executive Officer of PPMG and created the real estate loan investment funds under PPMG, including the Pacific Fund and the Freedom Fund. Hanf also controlled associated management companies under PPMG, including the Private Money Management Group, LLC and Pacific Private Money, Inc.

17. Defendant **Hoai-Nam Chu Phan a/k/a Nam Phan**, age 58, is a resident of Novato, California. Phan began working for Pacific Private Money, Inc., the primary operating company for the entities under PPMG, in October 2016. He was promoted to the position of Chief Operating Officer in 2020. Phan functioned as the chief operating officer for all the funds under the PPMG umbrella during the Relevant Period.

## RELATED ENTITIES

18. **Pacific Private Money Group LLC** is a Delaware limited liability company with its principal place of business in Novato, California. PPMG is the parent company of several funds that invested in real estate-backed loans, including the Pacific Fund and the Freedom Fund, as well as the funds’ associated management companies.

19. **Pacific Private Money Fund I LLC** is a Delaware limited liability company with its principal place of business in Novato, California. At all relevant times, the Pacific Fund was a subsidiary of PPMG.

20. **Pacific Freedom Fund LLC** is a California limited liability company with its principal place of business in Novato, California. At all relevant times, the Freedom Fund was a subsidiary of PPMG.

## FACTUAL ALLEGATIONS

### A. Background on the Pacific Fund

21. Starting in 2013, Hanf created several funds that pooled investor money for the purpose of originating or purchasing loans secured by real estate. These funds were structured as limited liability companies. During the Relevant Period, Hanf and Phan offered and sold securities to investors in the form of membership interests in the limited liability companies.

22. The first private investment fund that Hanf launched was the Pacific Fund, in 2013. During at least the Relevant Period, Hanf was the primary control person for the Pacific Fund. Hanf had access to and regularly reviewed the Pacific Fund's bank accounts and internal books and accounting records. At times, Hanf participated directly in the Pacific Fund's lending decisions, and he participated in meetings and email discussions regarding the financial status of the PPMG funds, including the Pacific Fund.

23. During the Relevant Period, Phan managed the day-to-day operations of the Pacific Fund. Among other responsibilities, Phan communicated with prospective investors about the fund, answered investors' questions about the fund's activities, and assisted with investors' subscription documents and other onboarding tasks. During at least the Relevant Period, Phan had access to the Pacific Fund's bank accounts, regularly discussed and reviewed the fund's internal financial and accounting information, and discussed and reviewed records relating to its loan origination business. Phan also participated in meetings and email discussions regarding the financial status of the PPMG funds, including the Pacific Fund.

24. According to its offering documents, including its offering memorandum, the Pacific Fund's purpose was to produce returns to investors by originating and acquiring real estate loans secured by non-owner-occupied, residential, multifamily, and other types of real property.

25. Hanf, in a letter attached to the offering memorandum, represented that the Pacific Fund "allows qualified investors to benefit from the highly-attractive returns available through real estate-secured note investing, without the struggle and frustration of competing for individual note investment opportunities." Hanf's letter also stated that the fund "eliminates the need for you to perform due diligence on individual loans and borrowers, and spreads risk of loss over a wide

portfolio of real estate-secured notes." In other words, investors would rely on the managerial efforts of Hanf, Phan, and others at the PPMG entities, who would use their expertise in real estate lending to originate or purchase loans secured by real estate and then generate returns for investors.

26. The offering memorandum indicated that the Pacific Fund would generate returns through loan origination and other loan-related fees, interest income on mortgage loans owned by the fund, and net sale proceeds from the disposition of fund assets. Investors' funds would be pooled together in order to generate these returns. Subject to the Pacific Fund's performance and sufficient cash flow, Pacific Fund investors would receive monthly distributions that included an established "preferred return" as well as half of the fund's excess distributable cash. The distributions could either be paid to investors in cash or reinvested in the Pacific Fund, depending on each investor's preference.

27. According to the offering memorandum, the Pacific Fund was managed by Private Money Management Group, LLC, a separate subsidiary of PPMG controlled by Hanf. The offering memorandum stated that the manager was entitled to receive a fee equal to 2% of the fund's assets under management plus 50% of the fund's excess distributable cash, after payment of the preferred return to investors.

**B. Background on the Freedom Fund**

28. In 2020, Hanf launched another private investment fund, the Freedom Fund. During at least the Relevant Period, Hanf was the primary control person for the Freedom Fund. Hanf had access to, and regularly reviewed, the Freedom Fund's bank accounts and internal books and accounting records. Hanf participated in meetings and email discussions regarding the financial status of the PPMG funds, including the Freedom Fund. Hanf also worked on finding new investors and marketing for the Freedom Fund.

29. During the Relevant Period, Phan managed the day-to-day operations of the Freedom Fund. Among other responsibilities, Phan communicated with prospective investors about the fund, answered investors' questions about the fund's activities, and assisted with investors' subscription documents and other onboarding tasks. During the Relevant Period, Phan had access to the Freedom Fund's bank accounts, discussed and reviewed the fund's internal

financial and accounting information, and discussed and reviewed records relating to its loan origination business. Phan also participated in meetings and email discussions regarding the financial status of the PPMG funds, including the Freedom Fund.

30. According to its offering documents, including its offering memorandum, the Freedom Fund raised money "to conduct the following business: to make, purchase, originate, fund, acquire, and/or otherwise sell loans secured by interests in real or personal property across the United States with a primary focus in California." The offering memorandum emphasized the short-term holding period for the loans in the Freedom Fund's portfolio, which would allow for greater liquidity than a traditional mortgage fund while also mitigating risks such as default risk from holding loans for longer periods.

31. According to the offering memorandum, the Freedom Fund would purportedly generate returns from loan interest, origination and other loan-related fees, and late fees. Investors' funds would be pooled together in order to generate these returns. The offering memorandum stated that Freedom Fund investors would receive monthly income distributions from the fund, which were fixed percentages payable prior to profit participation by the fund's manager. However, the distributions were not guaranteed and were subject to cash availability of the fund. Investors would rely on the managerial efforts of Hanf, Phan, and others at the PPMG entities, who would use their expertise in real estate lending to originate or purchase loans secured by real estate and then generate returns for investors.

32. During the Relevant Period, Defendants offered and sold investors securities in the form of membership interests in the Freedom Fund. The Freedom Fund was managed by Pacific Private Money, Inc., a subsidiary of PPMG controlled by Hanf that served as the operating company for the PPMG enterprise. According to the Freedom Fund's offering memorandum, the manager was entitled to 100% of the fund's net income, after payment of the fixed return to investors.

**C. Hanf and Phan Begin a Ponzi-like Scheme**

33. Starting with the year ending December 31, 2021, the Pacific Fund was not profitable. A large portion of the loans held by the Pacific Fund were non-performing, and while

interest was still accruing on the Pacific Fund's books as a receivable, this interest was in large part unpaid.

34. Additionally, Hanf decided to lend large amounts of the Pacific Fund's capital to a single borrower who later defaulted. This default significantly impaired the fund.

35. Because the Pacific Fund did not generate sufficient operating cash to pay its expenses, much less pay its investor distributions and redemptions, the Freedom Fund and other PPMG affiliates regularly transferred cash to the Pacific Fund starting at least in December 2021. These transfers were classified on the entities' books as short-term loans that accrued interest, but principal and interest on these "loans" were in large part never repaid. As the executives in control of the Pacific Fund and the Freedom Fund, Defendants knew of, or directed, these transfers, and knew or were reckless in not knowing that the Pacific Fund did not have sufficient cash or revenue to pay back these "loans."

36. The Pacific Fund remained unprofitable until the scheme collapsed in and around the fall of 2025. However, during the Relevant Period the Pacific Fund paid tens of millions of dollars to existing investors in the form of distributions or redemptions.

37. Even though the Pacific Fund was unprofitable and relied on new investor money and transfers from other PPMG entities to pay investor distributions and redemptions, Hanf and Phan continued to solicit, offer, and sell Pacific Fund securities to new investors. During the Relevant Period, Hanf and Phan raised approximately $7.3 million from over 60 investors in the Pacific Fund.

38. Starting with the year ending December 31, 2022, the Freedom Fund was likewise unprofitable. Like the Pacific Fund, a significant portion of the loans in the Freedom Fund's portfolio were non-performing. Additionally, the Freedom Fund's business model was impacted by the sudden rise in interest rates in 2022, which reduced the fund's capacity to originate new loans and generate resultant origination fees. Also, the Freedom Fund transferred significant amounts of its cash to other PPMG entities, including the Pacific Fund as described above, which further adversely impacted the fund.

39. From January 2022 to the end of the Relevant Period, the Freedom Fund did not

generate sufficient cash revenue to cover its expenses, resulting in the Freedom Fund operating at a loss from a cash perspective. Nevertheless, the Freedom Fund paid tens of millions of dollars to its investors in the form of distributions and redemptions. These payments were sourced predominantly from new investor money.

40. Despite this, Hanf and Phan continued to solicit, offer, and sell Freedom Fund securities to new investors and, during the Relevant Period, raised approximately $76.5 million from around 130 investors in the Freedom Fund.

41. During the Relevant Period, Hanf and Phan each authorized, directed, and/or otherwise caused new investor money coming into the Pacific Fund and the Freedom Fund to be used to pay tens of millions of dollars in purported returns and/or principal withdrawals to existing investors of both funds. These Ponzi-like payments were intended to deceive existing investors into believing that the funds continued to successfully generate profits from their real estate-backed loan businesses.

**D. Hanf Misappropriated Investor Funds to Pay Personal Expenses**

42. In addition to orchestrating Ponzi-like payments, from at least April 2021 to July 2025, Hanf misappropriated at least $7 million by transferring money from the Pacific Fund and the Freedom Fund to Hanf Capital LLC ("Hanf Capital"), an entity he created, solely owned, and controlled. Hanf Capital did not provide services to, or perform work on behalf of, PPMG and its family of funds but rather served Hanf's personal interests. In addition to making transfers to Hanf Capital, Hanf also at times diverted Pacific Fund and Freedom Fund investor capital for his unauthorized personal use through transfers to Pacific Realty Development LLC—another entity he owned and controlled that was unaffiliated with PPMG—and, to a lesser extent, directly to his personal bank account.

43. The internal records of the Pacific Fund and the Freedom Fund misleadingly characterized the misappropriated investor money as loans to Hanf's personal entities. However, as of the PPMG entities' bankruptcy filings in June 2026, the principal and interest of those supposed loans to Hanf's personal entities remained largely unpaid.

44. According to accounting records and bank records, Hanf primarily used the

misappropriated investor money in Hanf Capital's account to acquire, construct, service debt on, and pay property taxes on various real estate holdings; increase Hanf's personal equity stake in a new PPMG fund; fund the purse of a boxing match; and invest in a purported crypto asset venture. Hanf also used some of the misappropriated investor money to pay his personal living expenses, such as his home mortgage payment and his personal credit card bills.

45. Hanf did not disclose these expenditures to the defrauded investors of the Pacific Fund and the Freedom Fund even though he knew or was reckless in not knowing that he misappropriated investor money and directed the money to himself and his personal entities.

46. Hanf's failures to disclose his intention to misappropriate investment funds and his past practice of doing so were material to a reasonable investor as well as the actual defrauded investors of the Pacific Fund and the Freedom Fund. It would have been important for investors to know that Hanf had a practice of misappropriating money invested in the Pacific Fund and/or the Freedom Fund for his personal benefit—including to buy and maintain properties and to pay various other personal expenses—rather than using investor money solely for the funds' purported real estate-backed loan businesses.

47. Given his role managing the operations of the Pacific Fund and the Freedom Fund and through his access to the funds' bank records and accounting information, which showed the transfer of funds, Phan knew or was reckless in not knowing that investor funds were being misappropriated for Hanf's benefit.

### E. Hanf and Phan Made and Disseminated Materially Misleading Statements to Pacific Fund and Freedom Fund Investors

48. Throughout the Relevant Period when Hanf and Phan operated the Pacific Fund and the Freedom Fund as a Ponzi-like scheme, each Defendant separately and collectively made and disseminated numerous materially misleading statements to investors in both funds.

49. Specifically, Hanf and Phan misleadingly represented to investors in the Pacific Fund and the Freedom Fund that their money would be used by the respective funds to originate or purchase loans secured by real estate, and to pay expenses related to those lending activities.

50. These representations, which Hanf and Phan each made or disseminated in offering

documents, marketing materials, emails to investors, orally at in-person meetings, and/or in online webinars, were misleading because, in truth, Hanf and Phan used the vast majority of new money invested into the Pacific Fund and the Freedom Fund during the Relevant Period to make Ponzi-like payments to existing investors. In addition, Hanf at times used investor money to make purported loans to his personal entities for his personal benefit. Defendants did not disclose these uses of new investor money to investors in either fund.

51. For example, Hanf reviewed and approved the offering memorandum for the Pacific Fund, and Phan reviewed or was reckless in failing to review this document. Hanf and Phan sent the Pacific Fund's offering memorandum to investors, and it included the statement that one of the fund's main objectives was to "effectively deploy the proceeds of this Offering in well qualified Fund Assets," as well as the statement that "[a]ll Fund Assets shall be Mortgage Loans, or assignments thereof, secured by real estate." During the Relevant Period, these representations were misleading because, in truth, new investor money was primarily used to make Ponzi-like payments to existing investors or was misappropriated by Hanf. In fact, by August 2022, the Pacific Fund had stopped originating new real estate-backed loans.

52. Similarly, the offering memorandum for the Freedom Fund, which Hanf also reviewed and approved, which Phan reviewed or was reckless in failing to review, and which both Hanf and Phan sent to investors, represented that, other than for certain administrative expenses, the gross "[o]ffering proceeds will be available for investment in assets pursuant to the business plan of the Fund." The offering memorandum further stated that "the Fund loans held within the portfolio will be secured by interests in real or personal property across the United States with a primary focus in California." These representations were also misleading because, during the Relevant Period, the Freedom Fund used the vast majority of new investor money to make Ponzi-like payments to existing Freedom Fund investors, to the separate Pacific Fund, or, at times, to make purported loans to Hanf's personal entities.

53. Defendants made substantively similar misrepresentations to investors in their email communications, orally at in-person meetings, and/or on recorded video webinars posted on the Internet.

54. For example, in an August 2022 email, Hanf misleadingly told a potential investor that "[t]he Freedom Fund's capital is primarily used to fund and close loans that we intend to sell to third parties." As an additional example, in an in-person meeting with a potential investor in December 2024, Hanf told the potential investor that their money would be used to originate real estate loans.

55. Meanwhile, during the Relevant Period, Phan made misleading statements about the funds' intended use of investor money during direct in-person conversations with individual investors as well as in webinar sessions promoting the Freedom Fund in 2024 and 2025. For example, in July 2022, Phan met with a potential investor in the Pacific Fund and orally explained that the investor's money would be used to invest in first-lien position home loans. As another example, in a 2024 webinar entitled "How Investors Earn Consistent Income from Short-Term Real Estate Bridge Loans," Phan described "case studies" as examples of the types of loans that the Freedom Fund "typically" funded and outlined three example loans which were all secured by real estate with strong borrower credentials. This gave the misleading impression that the Freedom Fund typically used investor money to engage in the type of legitimate real estate lending described, when, in reality, by far the largest category of "loans" held by the Freedom Fund at this time was loans to other PPMG entities that were unsecured and to this day remain largely outstanding.

56. Defendants also misleadingly represented to investors that investors would receive preferred or fixed rates of return from the Pacific Fund and the Freedom Fund. These representations, which Hanf and Phan made or disseminated in offering documents, in emails to investors, and/or orally during in-person meetings or online webinars, were misleading because, during the Relevant Period, neither the Pacific Fund nor the Freedom Fund generated enough revenue through their legitimate lending businesses to pay returns to their respective investors, and the reality was that the returns were funded in large part from new investor money or transfers from other PPMG entities.

57. For example, in a February 2023 email to a potential investor, Hanf stated that the Freedom Fund "pays 9% on deposits over $1 million (slightly less on lower amounts), with 30-day

liquidity and monthly distributions." As another example, Hanf also represented to potential investors during a December 2024 in-person meeting that the investors would receive 9% returns on their investment and that he would never go below 6% returns. Hanf did not disclose in the February 2023 email or during the December 2024 in-person meeting that the touted returns were not from the fund's lending activities.

58. Phan also made misrepresentations to investors regarding the returns investors could expect from their investment. For example, in an October 2024 email discussion Phan had with an investor who was considering investing additional funds in the Freedom Fund, the investor asked, "[a]t $600K what would be the projected ROI?" In response, Phan advised the investor that the investor was "currently earning 8% annualized but we may be able to bump up the rate if you have over $600K invested." In this email exchange, Phan did not disclose that the investor's return on investment would be funded in large part by Ponzi-like payments such as those sourced from new investor capital.

59. Hanf made additional misleading statements about the performance of the Freedom Fund during online webinars by representing that the fund had provided consistent returns to investors without disclosing that the returns were not based on the Freedom Fund's earnings. For example, during a 2024 webinar, Hanf misleadingly stated that "we've been able to deliver what we call above-market returns, reliable above-market returns regardless of market cycle." In the webinar Hanf also presented a graph titled "Freedom Fund Performance" that showed returns to investors had increased consistently from 2020 to 2023. But Hanf did not disclose the material fact that, starting in at least 2022, most of those returns were paid in Ponzi-like fashion with new investor money rather than with the proceeds of any legitimate, real estate-backed lending activities.

60. The above misrepresentations were material to both a reasonable investor, as well as to actual investors of the Pacific Fund and the Freedom Fund, in deciding to purchase securities in the two funds, and investors were denied the opportunity to make fully informed investment decisions. It was important for investors to know what Hanf and Phan were doing with their money, and they would have wanted to know that their funds were often being used to make

Ponzi-like payments or to fund Hanf's personal expenses as opposed to supporting the lending activities described by Hanf and Phan. It was important to investors that their investments were secured by interests in real estate. Hanf's and Phan's representations about the purported uses of investor money to originate or purchase real estate-secured loans influenced investors' decisions to invest in the Pacific Fund and/or the Freedom Fund.

61. Additionally, investors would have wanted to know that the returns they were receiving and Defendants touted were not based on the earnings of the Pacific Fund and the Freedom Fund, which were in fact not profitable by the end of 2021 and 2022, respectively. Defendants' misleading statements about the funds' returns gave investors the false and misleading impression that their money was safe and that the funds were performing well.

**F. The Ponzi-Like Scheme Collapses**

62. By the fall of 2025, the Pacific Fund and the Freedom Fund were running out of money to pay investor distributions and redemptions, even with the use of new investor money. At this time, Hanf and Phan maintained a spreadsheet of outstanding investor redemption requests. Whenever the Pacific Fund or the Freedom Fund took in new investor capital, internal discussions, at times including Hanf and Phan, ensued about which outstanding redemptions or distributions this new capital should be spent on, including prioritizing redemptions for investors most likely to complain.

63. In October 2025, the Pacific Fund and the Freedom Fund ceased paying any distributions and redemptions to investors.

64. In December 2025, PPMG engaged a Chief Restructuring Officer.

65. On June 16, 2026, the Pacific Fund, the Freedom Fund, and related entities of PPMG filed for Chapter 11 bankruptcy protection.

**G. Hanf Acted with Scienter**

66. Hanf acted knowingly or recklessly in the offer or sale, and in connection with the purchase or sale, of interests in the Pacific Fund and the Freedom Fund, when making and disseminating misleading statements and engaging in other deceptive acts.

67. Hanf acted with scienter in making and disseminating misleading statements that

investor funds would be used to originate or purchase real estate loans, and/or that investors would receive a fixed or preferred return on their investments, because Hanf knew, or was reckless in not knowing, that he was using new investor contributions to the Pacific Fund and the Freedom Fund to make Ponzi-like payments to prior investors in the funds, rather than to originate or purchase loans for the benefit of the Pacific Fund and the Freedom Fund as represented. He reviewed the Pacific Fund's and the Freedom Fund's internal financial statements and accounting records, and he also had access to the funds' and other PPMG entities' bank accounts. Additionally, he received emails in which the use of new investor money to pay existing investors was discussed.

68. Hanf further knew, or was reckless in not knowing, that his representations that investor funds would be used to originate or purchase real estate loans were misleading because he was aware of his own practice of misappropriating investor money for his personal benefit.

69. Moreover, Hanf knew, or was reckless in not knowing, that the use of new investor money in the Pacific Fund and the Freedom Fund to make Ponzi-like payments to existing investors created the misleading impression that the funds were successful and generated sufficient income to pay the touted investor returns. Hanf was aware of the poor financial condition of the Pacific Fund and Freedom Fund, which had been unprofitable since at least the end of 2021 and 2022, respectively. Not only did he review the Pacific Fund's and Freedom Fund's internal financial statements and accounting records, he also participated in meetings and email discussions on the topic of the funds' poor financial condition and the lack of cash to pay investor returns and redemptions.

70. In addition, Hanf knew, or was reckless in not knowing, that his representations to investors during webinars that the Freedom Fund had historically provided regular and consistently increasing returns were misleading because, as described above, Hanf was aware that most of those purported returns were actually Ponzi-like payments made with new investor money rather than with the proceeds of any legitimate fund activities. As discussed above, Hanf knew that Ponzi-like payments were being made, participated in meetings and email conversations discussing the financial condition of the Freedom Fund and the lack of cash to pay Freedom Fund returns, and reviewed the Freedom Fund's internal financial statements and accounting records.

71. Hanf's scienter is further demonstrated by the fact that he directed the creation of false account statements and Schedule K-1 tax forms that were provided to investors, which purportedly reflected the investors' returns and income generated from the Pacific Fund's and Freedom Fund's activities. Those false documents helped perpetuate and conceal Hanf's and Phan's fraudulent scheme by providing investors with the false and deceptive sense that their investments in the funds were performing well and that their returns were legitimate rather than Ponzi-like payments.

**H. Phan Acted with Scienter**

72. Phan acted knowingly or recklessly in the offer or sale, and in connection with the purchase or sale, of interests in the Pacific Fund and the Freedom Fund, when making and disseminating misleading statements and engaging in other deceptive acts.

73. Phan acted with scienter in making and disseminating misleading statements that investor funds would be used to originate or purchase real estate loans, and/or that investors would receive a fixed or preferred return on their investments. Phan knew, or was reckless in not knowing, that he and Hanf were using new investor contributions to the Pacific Fund and the Freedom Fund to make Ponzi-like payments to prior investors in the funds, rather than to originate or purchase loans for the benefit of the funds and the funds' investors. Phan was aware of, and at times directly provided instructions regarding, the transfer of cash among the PPMG entities and the use of new investor money to make payments to prior investors. He also reviewed the Pacific Fund's and the Freedom Fund's internal financial statements and accounting records, and he had access to the funds' and various other PPMG entities' bank accounts.

74. Additionally, given his role managing the operations of the Pacific Fund and the Freedom Fund, and his review of the funds' internal financial statements and accounting records, Phan knew or was reckless in not knowing that investor money was being misappropriated for Hanf's benefit.

75. Moreover, Phan knew, or was reckless in not knowing, that the use of new investor money in the Pacific Fund and the Freedom Fund to make Ponzi-like payments to existing investors created the misleading impression that the funds were successful and generated sufficient

income to pay the touted investor returns. Phan was aware of the poor financial condition of the Pacific Fund and Freedom Fund, which had been unprofitable since at least the end of 2021 and 2022, respectively. He reviewed the Pacific Fund's and Freedom Fund's internal financial statements and accounting records. Additionally, he also participated in meetings and email discussions on the topic of the funds' poor financial condition and the lack of cash to pay investor returns and redemptions.

76. As with Hanf, Phan's scienter is further demonstrated by the fact that he directed the creation of false account statements that were provided to investors, which purportedly reflected the investors' returns and income generated from the Pacific Fund's and Freedom Fund's activities. Those false documents helped perpetuate and conceal Hanf's and Phan's fraudulent scheme by providing investors with the false and deceptive sense that their investments in the funds were performing well and that their returns were legitimate rather than Ponzi-like payments.

**FIRST CLAIM FOR RELIEF**

*Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder*

(Against Hanf and Phan)

77. The SEC re-alleges and incorporates by reference Paragraph Nos. 1 through 76 above.

78. Hanf and Phan, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of securities, by use of means or instrumentalities of interstate commerce, or of the mails, with scienter:

a. employed devices, schemes, or artifices to defraud;

b. made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

c. engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers of securities.

79. By reason of the foregoing, Hanf and Phan violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**SECOND CLAIM FOR RELIEF**

*Violations of Sections 17(a)(1) and (3) of the Securities Act*

(Against Hanf and Phan)

80. The SEC re-alleges and incorporates by reference Paragraph Nos. 1 through 76 above.

81. Hanf and Phan, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails:

a. with scienter, employed devices, schemes, or artifices to defraud; and

b. knowingly, recklessly, or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers.

82. By reason of the foregoing, Hanf and Phan violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)].

**THIRD CLAIM FOR RELIEF**

*Violations of Section 17(a)(2) of the Securities Act*

(Against Hanf)

83. The SEC re-alleges and incorporates by reference Paragraph Nos. 1 through 76 above.

84. Hanf, by engaging in the conduct described above, knowingly, recklessly, or negligently, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under

which they were made, not misleading.

85. By reason of the foregoing, Hanf violated, and unless restrained and enjoined will continue to violate, Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

**PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court:

**I.**

Enter an order permanently enjoining Hanf and Phan from directly or indirectly violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder, and Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)].

**II.**

Enter an order permanently enjoining Hanf from directly or indirectly violating Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

**III.**

Enter an order permanently enjoining Hanf and Phan from directly or indirectly, including, but not limited to, through any entity owned or controlled by each, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent each from purchasing or selling securities for each of their own personal accounts, pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Sections 21(d)(1) and (5) of the Exchange Act [15 U.S.C. §§ 78u(d)(1) and (5)].

**IV.**

Enter an order requiring Hanf to disgorge all ill-gotten gains received as a result of his unlawful conduct plus prejudgment interest thereon pursuant to Sections 21(d)(3), 21(d)(5), and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)].

**V.**

Enter an order requiring Hanf and Phan to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

**VI.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**VII.**

Grant such other and further relief as this Court may determine to be just, equitable, and necessary.

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38 and Civil Local Rule 3-6, the SEC demands a trial by jury on all issues so triable.

Dated: September 1, 2026

Respectfully submitted,

*/s/ Christine Hom*
Christine Hom
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION